# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs February 19, 2015

## STATE OF TENNESSEE v. TRACY DALE TATE

### Appeal from the Criminal Court for Knox County
### No. 98987A    Bob R. McGee, Judge

---

### No.  E2014-01191-CCA-R3-CD – Filed May 20, 2015

---

A Knox County jury found the Defendant, Tracy Dale Tate, guilty of one count each of sale and delivery of cocaine within 1,000 feet of an elementary school and one count each of sale and delivery of cocaine within 1,000 feet of a recreational center.  See Tenn. Code Ann. §§ 39-17-417, -432.  The trial court merged count two into count one and merged count four into count three, resulting in convictions for sale of .5 grams or more of cocaine within 1,000 feet of an elementary school and sale of .5 grams or more of cocaine within 1,000 feet of a recreational center.  The Defendant received a total effective sentence of thirty years.  In this appeal, the Defendant contends that the evidence was insufficient to support his convictions.  He further argues that the trial court erred by failing to merge his four guilty verdicts into a single conviction, and the State concedes this point.  Following our review, we conclude that the evidence was sufficient to support the Defendant's convictions, but we agree that the trial court erred by failing to merge all the Defendant's guilty verdicts into a single conviction, and we therefore remand for entry of a corrected judgment reflecting this merger.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed;
and Remanded for Entry of Corrected Judgments**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee, for the appellant, Tracy Dale Tate

Herbert H. Slatery III, Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Phillip H. Morton and Hector Sanchez, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### FACTUAL BACKGROUND

On February 21, 2011, the Defendant was charged in a four-count indictment with the following: sale of .5 grams or more of cocaine within 1,000 feet of an elementary school (count 1); delivery of .5 grams or more of cocaine within 1,000 feet of an elementary school (count 2); sale of .5 grams or more of cocaine within 1,000 feet of a recreational center (count 3); and delivery of .5 grams or more of cocaine within 1,000 feet of a recreational center (count 4). The case proceeded to trial where the following evidence was presented.

Sergeant Josh Shaffer with the Knoxville Police Department ("KPD") testified that he worked in the Repeat Offender Squad, which conducted investigations into "street level drug dealing." He testified that in December 2009, he was investigating a two or three block area in the Mechanicsville neighborhood, which was the source of "numerous, numerous complaints from the citizens." In particular, the police were investigating a house located on Cansler Avenue for suspected crack cocaine sales. Patrol officers had noticed that occupants of the house were "posting up" on the front porch. Sergeant Shaffer explained that "posting up means standing out somewhere visible where potential drug customers can see you, and you all can make eye contact and conduct a quick drug transaction."

Sergeant Shaffer testified that he arranged for an informant, Glen Palmer, to make an undercover purchase of drugs at the Cansler Avenue house. Sergeant Schaffer had worked with Mr. Palmer since 2007, and Mr. Palmer's previous undercover purchases had led to several arrests and successful prosecutions. According to Sergeant Shaffer, informants were routinely compensated for their work with the police, and Mr. Palmer was paid for his work in the instant case. Sergeant Shaffer acknowledged that Mr. Palmer was a former drug addict and that he had charges pending at the time he began working as an informant in 2007. According to Sergeant Shaffer, Mr. Palmer received "help" on his charges in exchange for his undercover work with the police, but at the time of the undercover operation in the instant case, he had no charges pending.

Sergeant Shaffer explained that on December 30, 2009, the KPD began surveilling the Cansler Avenue area "to begin getting eyes on to [sic] see what was happening at [the house] to see if there was activity, to see if there was potential drug dealing going on . . . ." He met with Mr. Palmer to "set the parameters" for the buy, which included instructions to "go directly" to the house; "walk directly back"; "don't vary from it"; "don't talk to other people"; and "don't meet other people." Sergeant Shaffer searched Mr. Palmer to ensure that he had no contraband, money, or weapons on his person and then outfitted him with a recording device and transmitter so that officers could monitor

the transaction. He explained that other officers were in the area conducting surveillance "just in case something happened [so] that we could get in and protect the informant . . . ." Additionally, one officer utilized a video camera to record the transaction.

Sergeant Shaffer provided Mr. Palmer with $120, with instructions that he should first attempt to purchase forty dollars worth of crack cocaine and that, if the initial transaction was successful, then Mr. Palmer should "attempt to make the whole purchase of [$]120, which [was] what occurred." Sergeant Shaffer made a copy of the money he provided to Mr. Palmer so that the serial numbers could be tracked. The plan was to drop Mr. Palmer off "about one block south and one block over" from the suspect house. Sergeant Shaffer explained that the officers involved in this particular undercover buy were well-known in the neighborhood; thus, they needed to drop the informant far enough away that no one would see the informant exiting a vehicle driven by a police officer. He testified that officers "had constant eyes on [Mr. Palmer] at all times."

Glen Palmer testified that he had a history of addiction to crack cocaine but that he eventually decided to "try to cut [his] ties to that community" and get help for his addiction. He first met Sergeant Shaffer through another officer and began working as a confidential informant, which led to the State's dropping of drug-related charges that were pending at the time.

Mr. Palmer testified that he was familiar with the house on Cansler Avenue because he had purchased drugs there in the past. On December 30, 2009, Sergeant Shaffer called him and asked whether he wanted to make an undercover purchase, to which Mr. Palmer agreed. He met Sergeant Shaffer who searched him and outfitted him with a wire microphone. The officers set up surveillance and dropped him off with money. He testified that he did not have any drugs on him and had no money other than the $120 provided to him by Sergeant Shaffer.

Mr. Palmer then walked to the house, where he told "three individuals[,] [a] woman and two men" that he wanted to purchase crack cocaine. He testified that he did not know any of the individuals and had never seen them before. They told him to "go around to the side driveway and wait." One of the individuals walked over to him, and they "talked about how much cocaine [he] was purchasing. . . . And we also talked about me buying more than what he brought originally." Initially Mr. Palmer bought "[f]orty dollars worth" or "[t]wo rocks," and he then asked "if for another [eighty dollars,] [he] could buy an eight ball." The individual told him that he did not have that much on him and "would have to go get it." He came back a few minutes later with the additional cocaine, and Mr. Palmer left the house.

Mr. Palmer testified that, in total, he purchased six "rocks," worth $120. He testified that he could not "[one] hundred percent" identify the person from whom he bought drugs. However, he said that "the only gentleman that I dealt with there was the one that walked off the porch to me, had the hood on and the band on his head. That was the only person that I dealt with, and that's who sold me the drugs."

A recording of the video footage was played for the jury, with Sergeant Shaffer answering questions and explaining to the jury what was happening in the recording. Sergeant Shaffer identified three individuals that could be seen on the videotape: the Defendant, Alfred Lamar Griffin, and Tasha Griffin. Sergeant Shaffer identified Mr. Griffin as the "taller one" who was wearing a "hoodie" and the Defendant as the man seen wearing a toboggan. Sergeant Shaffer described the Defendant's behavior as "posting up." Mr. Palmer could be seen walking up to the house and speaking with the Defendant. Mr. Palmer then walked to the side of the house, while the Defendant knocked on the door to the house, and Ms. Griffin emerged. Ms. Griffin reached into "her bra area, which is a common place for females to conceal drugs," pulled "something out," and then "hand[ed] the Defendant something." The Defendant then walked toward the side of the house where Mr. Palmer was located.[1]

Next, the Defendant could be seen walking back onto the porch, where he talked briefly to both Mr. and Ms. Griffin. Mr. Griffin "reach[ed] into his hoodie pocket, [and] [brought] something out that appear[ed] white or clear in color . . . ." Sergeant Shaffer opined that, at this point, the Defendant was getting more crack cocaine for Mr. Palmer, who had been instructed to purchase a larger amount of cocaine if the first, smaller transaction was successful. On the videotape, the Defendant can be seen walking back towards the side of the house, where Mr. Palmer was still located, and is next seen coming back towards the porch with "something in his hand that's obviously tangible like paper or money."

Following the transaction, Mr. Palmer walked back up the street and was picked up by Sergeant Shaffer a few blocks away. Mr. Palmer immediately turned over "several white rocks," and Sergeant Shaffer put them in "a little baggie" to protect them, which he sealed with evidence tape. He also retrieved the transmitter and recording device from Mr. Palmer. Sergeant Shaffer traveled with Mr. Palmer to an "offsite location" where he was subjected to another search to ensure that he did not possess any additional money or drugs, which he did not. Sergeant Shaffer next interviewed Mr. Palmer, getting a "description of who [he] dealt with[,] [a]nd kind of a play by play in [his] words as to what happened."

---

[1] This part of the transaction is not visible on the videotape because Mr. Palmer was located on the side of the house, which was obscured by shrubbery. Nonetheless, Mr. Palmer can be seen walking behind the shrubs, and the Defendant followed Mr. Palmer after being handed "something" by Ms. Griffin.

The white rocks recovered from Mr. Palmer weighed .9 grams at the scene. Sergeant Shaffer testified that he was aware that the Tennessee Bureau of Investigation lab report reflected a weight of .5 grams but explained that the discrepancy was due to evaporation that occurred in the time between the field and lab measurements.[2]

Sergeant Shaffer reviewed the audio recording from Mr. Palmer's transmitter. Although much of the recording was indecipherable, he was able to identify the voices on the recording as belonging to Mr. Palmer and the Defendant.

Sergeant Shaffer testified that he went to the Cansler Avenue house shortly after this transaction occurred under the guise of investigating a recent robbery in the area. He testified that five to ten minutes after the deal occurred, he approached the house so that he could identify the people who had sold Mr. Palmer drugs. He immediately identified the Defendant and Mr. Griffin, who were both standing outside when he pulled up to the house. Mr. Griffin entered the house while the Defendant remained on the porch. Sergeant Shaffer walked up to the Defendant and told him that the police had seen robbery suspects heading in the direction of the house. While speaking with the Defendant, Sergeant Shaffer was able to see a "ten dollar bill and then some loose ones." Sergeant Shaffer asked the Defendant whether he could see what was in his pockets, and the Defendant showed Sergeant Shaffer the money he had in his pockets. Sergeant Shaffer testified that he was able to look at a ten dollar bill in the Defendant's possession and saw that the serial numbers ended in "62A," which he later confirmed matched the previously recorded money he had given to Mr. Palmer.

On cross-examination, Sergeant Shaffer testified that Mr. Palmer was compensated $100 for his work on this case. He testified that the Defendant did not own the Cansler Avenue house. Sergeant Shaffer acknowledged that there were no photos of Mr. Palmer once he "disappeared off camera" behind the bushes, where the actual drug transaction took place. He also testified that the Defendant was not arrested that day because there was an ongoing investigation, and he wanted to protect the identity of the informant for as long as possible. He agreed that there are "several bills out there" that end in "62A" and that he was unable to verify the rest of the serial number.

Donna Roach, of Knoxville Geographic Information Systems, testified that the Cansler Avenue house was located 873 feet from Maynard Elementary School and 388 feet from the Boys & Girls Club.

---

[2] Sergeant Shaffer explained that crack cocaine is manufactured by adding powder cocaine to water and then cooking it. Water is absorbed into the cocaine during this process, leaving the resulting crack cocaine product "slightly moist." Over time, crack cocaine dries out as a result of the water evaporating, leading to a "field" weight that is often slightly higher than the lab weight.

Following a <u>Momon</u> colloquoy, <u>see</u> <u>Momon v. State</u>, 18 S.W.3d 159, 161-62 (Tenn. 1999), the Defendant elected not to testify. The jury convicted the Defendant on all counts.

ANALYSIS

*I. Sufficiency of the Evidence*

On appeal, the Defendant first contends that the evidence is insufficient to support his convictions because there was no video recording of the actual transfer of cocaine from the Defendant to the informant. The Defendant further contends that the informant was unable to identify the person who sold him cocaine. The State responds that the "totality of the evidence presented supports the jury's verdicts."

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. <u>See</u> <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." <u>Bland</u>, 958 S.W.2d at 659; <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." <u>State v. Cooper</u>, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." <u>State v. Williams</u>, 657, S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 326.

The following standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." <u>State v. Pendergrass</u>, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. <u>State v. Dorantes</u>, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected

-6-

the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971)) (quotation marks omitted).

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Dorantes, 331 S.W.3d at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference . . . ." Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

It is an offense for a defendant to knowingly manufacture, deliver, sell, or possess with the intent to manufacture, deliver, or sell cocaine. Tenn. Code Ann. § 39-17-417(a). It is a Class B felony to commit any of these acts when the amount of the cocaine is .5 grams or more. Tenn. Code Ann. § 39-17-417(c)(1). A violation of Tennessee Code Annotated section 39-17-417 that occurs within 1,000 feet of an elementary school "shall be punished one (1) classification higher than is provided in [section] 39-17-417[(c)] for such violation." Tenn. Code Ann. § 39-17-432(b)(1). The identity of the perpetrator "is an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006).

Viewed in the light most favorable to the state, the evidence showed that the Defendant was present with two other individuals on the porch of the suspect house when Mr. Palmer approached the group and asked to purchase crack cocaine. Although Mr. Palmer could not specifically identify the person from whom he bought drugs, he confirmed that only one individual walked over to the area of the porch where he was standing and that person sold him drugs. Sergeant Shaffer identified the Defendant as the person seen on the video walking to that area of the porch. He also identified the Defendant's voice on the audio recording of the transaction. Furthermore, Mr. Palmer was supplied with $120 and searched both before and after the controlled buy. Before the buy, Mr. Palmer had no drugs and only the money supplied by the police; afterwards, he had six "rocks" of cocaine and no money. Officers in the area had "constant eyes" on Mr. Palmer during the entirety of his approach and return from the Cansler Avenue house. There is no requirement that there be an audio or a video recording of a drug sale in order to establish a violation of Tennessee Code Annotated section 39-17-417. There was ample evidence produced at trial from which the jury could infer that the Defendant sold and delivered crack cocaine to the informant within 1,000 feet of a school and recreational center as charged in the indictment. The Defendant's argument is without

merit.

*II. Merger*

The Defendant next contends that the trial court erred by not merging all four convictions into a single conviction. The Defendant argues that the separate counts charging "the same act" within two drug free zones were alternate theories of the same offense and that his multiple convictions violate principles of double jeopardy. The State concedes the point, acknowledging that the Defendant "committed a single sale of cocaine in overlapping school zones" and requesting that this court remand the case with instructions to merge count three into count one.

Initially, we note that the Defendant failed to include this issue in his motion for a new trial. Ordinarily, such a failure results in waiver of the issue on appeal. See Tenn. R. App. P. 3(e). However, because Rule 3(e) "operates as a waiver of only those issues in which a new trial is the remedy for the error," see State v. Cole Woodard, W2011-02224-CCA-R3-CD, 2012 WL 4057266, at *4 (Tenn. Crim. App. Sept. 17, 2012), and a new trial is not the remedy for a double jeopardy error, we conclude that this issue is properly before us.

Both the United States and Tennessee constitutions protect an accused from being "twice put in jeopardy of life or limb" for "the same offense." U.S. Const. amend. V; Tenn. Const. art. 1, § 10. Our state supreme court has "noted many times, three fundamental principles underlie double jeopardy: (1) protection against a second prosecution after an acquittal; (2) protection against a second prosecution after conviction; and (3) protection against multiple punishments for the same offense." State v. Denton, 938 S.W.2d 373, 378 (Tenn. 1996) (citing Whalen v. United States, 445 U.S. 684, 688 (1980); United States v. Wilson, 420 U.S. 332, 342 (1975); North Carolina v. Pearce, 395 U.S. 711, 717 (1969)). The present challenge falls within the province of the third principle.

When a defendant faces multiple convictions for violating the same statute, a double jeopardy claim can be characterized as a "unit-of-prosecution" claim. See State v. Watkins, 362 S.W.3d 530, 543 (Tenn. 2012). In such cases, the court's proper course is to determine "what the legislature intended to be a single unit of conduct for purposes of a single conviction and punishment." Id. (quoting George C. Thomas, A Unified Theory of Multiple Punishment, 47 U. Pitt. L. Rev. 1, 3 n.3 (1985)). In making this determination, courts apply the "rule of lenity," resolving any ambiguities in defining the unit of conduct for prosecution "against the conclusion that the legislature intended to authorize multiple units of prosecution." Id. (citing Gore v. United States, 357 U.S. 386-391-92 (1958)). "Merger of convictions is sometimes necessary in order to remedy the

double jeopardy problem of multiple punishment." State v. Arturo Jaimes Garcia, No. M2009-00891-CCA-R3-CD, 2010 WL 5343286, at *17 (Tenn. Crim. App. Dec. 22, 2010) (citing State v. Beard, 818 S.W.2d 376, 379 (Tenn. Crim. App. 1991)).

Tennessee Code Annotated section 39-17-432(b)(1) provides in pertinent part that "[a] violation of [section] 39-17-417 . . . that occurs . . . within one thousand feet . . . of the real property that comprises a public or private elementary school, . . . or recreational center . . . shall be punished one (1) classification higher than is provided in [section] 39-17-417(b)-(i) for such violation." The drug-free zone violation is not a separate offense and is not an essential element of the 39-17-417 offense; rather, the violation allows for increased punishment for a defendant's conviction pursuant to 39-17-417. Garcia, 2010 WL 5343286, at *18. Indeed, "both the caption of the Act and the policy statement set forth in the subsection (a) of the Act reflect the purpose of the legislature, not to create a new offense, but rather to create drug-free school zones by enhancing penalties for violations of Tenn. Code Ann. § 39-17-417 occurring inside the zones." State v. Smith, 48 S.W.3d 159, 168 (Tenn. Crim. App. 2000).

In the present case, the judgments indicate that the Defendant stands convicted of two offenses: sale of .5 grams or more of cocaine within 1,000 feet of an elementary school and sale of .5 grams or more of cocaine within 1,000 feet of a recreational center. At the sentencing hearing, the trial court initially stated that it would be merging counts two, three, and four into count one. However, the prosecutor argued that "count two would merge with count one, and four would merge with count three, but they're different elements. One was a school and one was a [recreational center]." The judgments reflect that the trial court treated the Defendant's single sale of cocaine in two, overlapping drug-free zones as separate offenses.

However, as we previously noted, the drug-free zone violation is not an essential element of the 39-17-417 offense; nor is such a violation a separate offense in and of itself. See Smith, 48 S.W.3d at 168. Therefore, we conclude that the legislature did not intend to allow for multiple units of prosecution under 39-17-432 for a single sale of cocaine purusant to 39-17-417 that occurred in overlapping drug-free zones. Accordingly, the jury's four guilty verdicts should have been merged into a single conviction. We therefore remand to the trial court for the entry of corrected judgments reflecting the merger of the Defendant's multiple guilty verdicts into a single conviction.

## CONCLUSION

Based on the foregoing and the record as a whole, we affirm the Defendant's conviction, but remand for the entry of corrected judgments.

_____
D. KELLY THOMAS, JR., JUDGE